IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL L. GUIDRY,<br><br>      Plaintiff,<br><br>  v.<br><br>MARINE ENGINEERS' BENEFICIAL ASSOCIATION, et al.,<br><br>      Defendants.<br>_____/ | No. C 05-03960 CRB<br><br>**ORDER** |

    Paul Guidry ("Plaintiff") is an African-American marine engineer. The Marine Engineers' Beneficial Association ("Defendant" or "MEBA") is a mariners' union. In 2003, Plaintiff filed a lawsuit against Defendant and two other marine companies, Patriot Contract Services and American Ship Management, asserting various causes of action against them, including racial discrimination and harassment. In 2005, pursuant to a settlement agreement, Plaintiff dismissed with prejudice all of his claims against MEBA.

    In 2006, Plaintiff filed this suit against MEBA and two different marine companies, Marine Transport Lines and Crowley Maritime Corporation, again alleging that the defendants discriminated against him on the basis of his race, and also alleging that the union retaliated against him in response to his previous lawsuit. Plaintiff's complaint sets forth the following causes of action: (1) a claim of racial discrimination under both federal and

1  California law; (2) a claim of retaliation under both federal and California law; (3)
2  harassment on account of race and the creation of a hostile work environment, which he
3  presents as claims under both federal and California law; (4) interference with prospective
4  economic relations, a tort claim under California law; (5) wrongful termination in violation
5  of public policy; (6) intentional infliction of emotional distress, a tort claim under California
6  law; and (7) negligence, also a tort claim under California law.  Subsequently, Plaintiff
7  stipulated to the dismissal of the two marine companies, leaving MEBA as the only
8  remaining defendant.  Now pending before the Court is MEBA's motion for summary
9  judgment on the causes of action asserted against it.  For the reasons set forth below,
10 Defendant's motion for summary judgment is GRANTED in part and DENIED in part.

## BACKGROUND

12  Since 1988, Plaintiff has been a member of MEBA, a union that negotiates with
13 employers on behalf of mariners such as himself.  Under the union's "hiring hall" system,
14 MEBA posts available jobs whenever a contracted employer makes positions available to
15 union members.  MEBA classifies its members into three groups and then permits members
16 in each of these group to "bid" on available jobs, with the most senior group bidding first.
17 The priority of the bidding within each group, as well as each member's placement in a given
18 group, is determined by the number of years of that the member has belonged to the union,
19 the amount of time the member has been off work, and the member's "sea time," meaning
20 the number of hours worked during a certain period of time on union jobs.

21  This lawsuit arises out of two jobs on which Plaintiff successfully submitted bids to
22 work.  The first was a one-day job with American Ship Manufacturing, the company he had
23 previously sued for racial discrimination.  Plaintiff submitted a bid to work on a project with
24 the company in or around March of 2005, and he initially received the job.  Subsequently,
25 however, Plaintiff was told that he could not work on the job.  The second job was a multi-
26 week engagement aboard a ship called the *Cape Horn*, a vessel owned by the United States
27 government and, at the time of Plaintiff's hire, crewed by a company called Marine Transport
28 Lines, which employed MEBA members.  Plaintiff bid on and received employment on the

2

*Cape Horn* and began working there on or around June 27, 2005. Approximately five weeks later, on August 1, 2005, Plaintiff was terminated. A week after that, on August 8, 2005, Marine Transport Lines lost its contract with the United States government to staff the *Cape Horn* and all MEBA members were terminated from their positions on the ship. According to MEBA, these events all occurred within 60 days of Plaintiff's hire on the *Cape Horn*, and were therefore governed by a collective bargaining agreement between MEBA and Marine Transport Lines, which provided in part that all new hires are subject to an initial 60-day probationary period during which Marine Transport Line enjoyed discretion to terminate employees "for any lawful reason." Decl. of William P. Doyle, Ex. C, at 4.

Plaintiff subsequently filed a grievance with MEBA complaining of racial discrimination and harassment during his time aboard the *Cape Horn*. In response to the grievance, MEBA conducted an investigation into the circumstances of Plaintiff's working conditions on board the *Cape Horn*, as well as into the details of his termination. By its own admission, MEBA considered Plaintiff's grievance unlikely to succeed, but nonetheless proceeded to arbitration on his behalf when Marine Transport Lines was not forthcoming with responses to MEBA's investigation. Shortly thereafter, Plaintiff alleged that MEBA, and particularly Representative James Anderson, had engaged in racial discrimination and harassment as well. In response, MEBA conducted an internal investigation of Plaintiff's allegations. Plaintiff subsequently settled his suit against Marine Transport Lines and Crowley Maritime Corporation, and he instructed MEBA to dismiss his grievance against them. All that now remains are Plaintiff's claims against MEBA.

This much is undisputed. The parties, however, provide very different accounts of the details surrounding these events. To the extent that these competing accounts are relevant to the pending motion for summary judgment, they are discussed below.

## DISCUSSION

At the outset, the Court notes that two of Plaintiff's seven causes of action--his claim for racial discrimination (First Cause of Action) and his claim for wrongful termination (Fifth Cause of Action)--were advanced only against the two marine companies, Marine Transport

3

Lines and Crowley Maritime Corporation, and not against MEBA. Thus, these claims have been dismissed with prejudice and the Court has no occasion to consider them here. In addition, Plaintiff has explicitly declined to oppose Defendant's motion for summary judgment on his claims for harassment and hostile work environment (Third Cause of Action), for intentional infliction of emotional distress (Sixth Cause of Action), and for negligence (Seventh Cause of Action). As to these three claims, therefore, Defendant's motion for summary judgment is hereby GRANTED. The Court here considers only the remaining two claims as to which Plaintiff actually opposed summary judgment: his claim for retaliation, under both federal and state law (Second Cause of Action), and his tort claim for interference with prospective economic relations (Fourth Cause of Action).

## I. Preemption

As an initial matter, the Court must address MEBA's argument that Plaintiff's state-law claims are preempted by federal labor law. Generally speaking, federal law exclusively governs all claims "for violation of contracts between an employer and a labor organization." 29 U.S.C. § 185(a). Thus, federal courts lack jurisdiction to entertain state-law claims that require the interpretation of a labor contract, such as a collective bargaining agreement. See Elec. Workers v. Hechler, 481 U.S. 851, 863 & n.5 (1987); Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 218 (1985); Teamsters v. Lucas Flour Co., 369 U.S. 95, 103-04 (1962). As the Ninth Circuit has explained, state-law claims are preempted if "their evaluation is 'inextricably intertwined with consideration of the terms of [a] labor contract.'" Hayden v. Reickerd, 957 F.2d 1506, 1509 (9th Cir. 1992) (quoting Allis-Chalmers, 471 U.S. at 213). By contrast, if state-law claims involve "nonnegotiable state-law rights . . . independent of any right established by contract," meaning that they only tangentially or superficially implicate a labor contract, then such claims are not preempted by federal law. Miller v. AT&T Network Sys., 850 F.2d 543, 546 (9th Cir. 1988) (quoting Allis-Chalmers, 471 U.S. at 213).

Here, Plaintiff initially asserted several causes of action under California law. Two such state-law claims now remain: first, interference with prospective economic relations, see

4

United States District Court
For the Northern District of California

1  Korea Supply Co. v. Lockheed Martin Corp., 29 Cal.4th 1134, 1153-54 (2003), and second,
2  violations of California's Fair Employment and Housing Act ("FEHA"), see Cal. Gov't Code
3  §§ 12940-12951.  Defendant contends that these claims are both preempted by federal law.
4        As for the former claim, the Court agrees with Defendant that Plaintiff's cause of
5  action for interference with prospective economic relations is preempted.  The Ninth Circuit
6  has repeatedly held that federal courts lack jurisdiction to adjudicate claims for this
7  California tort in the context of labor disputes.  See Milne Employees Ass'n v. Sun Carriers,
8  960 F.2d 1401, 1412 (9th Cir. 1991); Cal. Elec. Co. v. Briley, 939 F.2d 790, 793 (9th Cir.
9  1991);  Scott v. Machinists Automotive Trades Dist. Lodge No. 190, 827 F.2d 589, 591-92
10 (9th Cir. 1987); Evangelista v. Inlandboatmen's Union of the Pacific, 777 F.2d 1390,
11 1400-01 (9th Cir. 1985).  These decisions uniformly rest on the logic that a plaintiff cannot
12 prevail on this tort claim unless he can demonstrate "(1) an economic relationship between
13 plaintiff and a third party, with the probability of future economic benefit to the plaintiff, (2)
14 defendant's knowledge of the relationship, (3) intentional acts by the defendant designed to
15 disrupt the relationship, (4) actual disruption of the relationship, and (5) proximately caused
16 economic harm to the plaintiff."  Milne, 960 F.2d at 1411-12 (citing Pac. Gas & Elec. Co. v.
17 Bear Stearns & Co., 50 Cal.3d 1118, 1126 & n.2 (1990)).  In the context of a labor dispute
18 such as this one, a court can only evaluate the economic relationship between a plaintiff and
19 a third party by reference to their contractual agreements.  Id. at 1412.  Thus, because a claim
20 for interference with prospective economic relations necessarily requires a court to consider
21 and interpret the meaning of a labor contract, such claims are preempted.
22       Plaintiff suggests, without citation to any decision by the Ninth Circuit (or by other
23 court, for that matter), that his claim for interference with prospective economic relations
24 should not be preempted because it "does not depend on a contractual provision."  Pl's. Opp.
25 to Def's Mot. for Summ. J. at 17-18.  Yet Plaintiff has failed to identify a single case in
26 which a union member has been permitted to proceed against a union with a claim for
27 interference with prospective economic relations.  Furthermore, contrary to Plaintiff's bald
28 assertion, this case *would* require this Court to examine the contractual relationship between

5

Plaintiff, his union, and his employers. While it may be true that the nature of the alleged contractual violation, *i.e.* MEBA's alleged effort to have Plaintiff terminated from his position, may not hinge directly on a contested contractual provision, this tort claim nonetheless would require the Court to scrutinize Plaintiff's contract with the union and his employers, either to identify specific violations of the agreement or, more likely, to determine the amount of damages due to Plaintiff as a result of MEBA's alleged conduct. Indeed, the "economic relations" with which MEBA is alleged to have interfered can be established only with specific reference to the future economic benefits that Plaintiff would have received through his membership with the union or his employment with Marine Transport Lines. Because this case, like every other case on point decided by the Ninth Circuit, would require an examination of Plaintiff's contractual rights and obligations to the union and his employers, see Milne, 960 F.2d at 1412; Briley, 939 F.2d at 793; Scott, 827 F.2d at 591-92; Evangelista, 777 F.2d at 1400-01, it is preempted. Plaintiff's motion for summary judgment as to his Fourth Cause of Action for interference with prospective economic relations is GRANTED.

The latter claim for retaliation, however, presents a more complex question about preemption. In general, the Ninth Circuit has held that claims of discrimination under California's Fair Employment and Housing Act law are not preempted by federal law. See Ramirez v. Fox Television Station, Inc., 998 F.2d 743, 748 (9th Cir. 1993) ("In every case in which we have considered an action brought under the California Employment Act, we have held that it is not preempted . . . ."); see also Cook v. Lindsay Olive Growers, 911 F.2d 233, 240 (9th Cir. 1990) (religious discrimination); Jackson v. So. Cal. Gas Co., 881 F.2d 638, 644 (9th Cir. 1989); (racial discrimination); Chmiel v. Beverly Wilshire Hotel Co., 873 F.2d 1283, 1286 (9th Cir. 1989) (age discrimination); Ackerman v. Western Elec. Co., 860 F.2d 1514, 1517-18 (9th Cir. 1988) (disability discrimination); Carter v. Smith Food King, 765 F.2d 916, 921 & n.6 (9th Cir. 1985). These cases rest upon the view that "the rights conferred by the California Employment Act are 'defined and enforced under state law without reference to the terms of any collective bargaining agreement,'" Ramirez, 998 F.2d

6

at 748 (quoting Chmiel, 873 F.2d at 1286), and that "[a]ctions asserting those rights are thus independent of collective-bargaining agreements," id. (quoting Ackerman, 860 F.2d at 1517). Thus, as a general matter, claims of retaliation or racial discrimination under FEHA, such as those set forth in Plaintiff's complaint, are not preempted simply because they involve a relationship that is governed by a labor contract.

On rare occasions, however, courts have found that claims under FEHA *are* preempted. For example, in Audette v. Longshoremen's and Warehousemen's Union, 195 F.3d 1107, 1113 (9th Cir. 1999), the Ninth Circuit held that a union member's retaliation claim was preempted by federal law. Similarly, in Madison v. Motion Picture Set Painters and Sign Writers Local 729, 132 F. Supp. 2d 1244, 1252-54 (C.D. Cal. 2000), a district court in the Ninth Circuit held that one (but not all) of an African-American painter's state-law claims of racial discrimination against his union was preempted. These two cases represent an exception to the general rule set forth in the Ninth Circuit's jurisprudence that state-law claims of discrimination are generally not preempted. That exception, however, is a narrow one; state-law claims are preempted only when the resolution of an allegation of discrimination *itself* hinges on the interpretation of a labor contract. In Audette, for example, the Ninth Circuit held that the retaliation claim was preempted because it required the court to determine whether the terms of a prior settlement agreement provided the union with a legitimate justification for its conduct. Audette, 195 F.3d at 1113 ("The instant case does not involve a free-standing claim of discrimination. . . . Here, resolution of the discrimination and retaliation claim turns on defendants' offer of a 'legitimate nondiscriminatory reason' requiring interpretation of the collective bargaining agreement . . . ."). In the same way, the district court in Madison also distinguished independent claims of discrimination from claims that rest upon a contested interpretation of contractual terms. Compare Madison, 132 F. Supp. 2d at 1252 (holding that one discrimination claim was *not* preempted because "there [was] no dispute respecting the meaning of the [relevant contractual] provisions, [and so] no interpretation of the [contract was] required"), with id. at 1153-54 (concluding that another discrimination claim *was* preempted because "[plaintiff's] prima facie case will require resort

7

to the [contract], . . . [and] it is almost certain that the [defendant's] articulated non-discriminatory reason for the action it took will require resort to the [contract]").

The question here, then, is whether the particular claim of retaliation advanced by Plaintiff requires the resolution of some dispute about the scope or meaning of the contractual agreement between Plaintiff and MEBA. In this case, Plaintiff asserts:

> 89. After Plaintiff filed a lawsuit against the union, he was made to endure verbal and physical harassment, daily interrogation, intimidation, threats, and taunts because he exercised his rights to complain (and file a lawsuit) alleging unlawful discrimination.
>
> 90. After [Plaintiff] filed a lawsuit against the union, defendants forced him off a job, having his employment with American Ship Management terminated. After he filed a lawsuit against the union, defendants relegated [Plaintiff] to a second class membership status by repeatedly threatening him with termination, announcing he was not entitled to fair and equal representation, and failing to represent him at the meeting during which he was terminated. Defendants refused to log in [Plaintiff's] grievance about the termination until after they completed an investigation of [Plaintiff's] claims.

Compl. ¶¶ 89-90. In light of these allegations, the Court cannot conclude that Plaintiff's claim for retaliation would require the interpretation of any particular disputed contractual provision. Nor does the evidence introduced by the parties suggest that the resolution of this claim would require specific examination of a labor agreement. To the contrary, Plaintiff's claim rests primarily on alleged conduct by MEBA that entails no quarrel over the meaning of contractual terms at all. Indeed, the union does not (nor could it) claim that its contract with Plaintiff is susceptible to any construction that would permit it to subject him to "verbal and physical harassment, daily interrogation, intimidation, threats, and taunts because he exercised his right to complain." Id. ¶ 89. This type of retaliatory conduct requires no scrutiny of any contract. MEBA argues that Plaintiff's claim would require examination of the collective bargaining agreement that permits termination during the probationary period of Plaintiff's first 60 days of employment. This argument is wholly unpersuasive: the collective bargaining agreement permits termination, even during the probationary period, only "for any *lawful* reason," and there can be no dispute here that termination on account of race or in response to a lawsuit for racial discrimination does not constitute a lawful justification for firing a union member. Therefore, to the extent that Plaintiff's claim for

8

1  retaliation rests upon the theory that union representatives caused him to be subjected to such
2  degrading treatment, Plaintiff's FEHA claim clearly is not preempted .

3        What makes this case potentially more difficult is the fact that Plaintiff's FEHA claim also rests in part on the theory that MEBA "fail[ed] to represent him at [a] meeting during which he was terminated" and "refused to log [his] grievance about the termination until after [it] completed an investigation." Id. ¶ 90.  These allegations *do* implicate the contractual relationship between MEBA and Plaintiff, since they require the Court to assess the obligations owed by MEBA to Plaintiff in the course of its representation--for example, whether the union had a right to conduct an investigation prior to pursuing his grievance against an employer.  Thus, at least in part, Plaintiff's claim for retaliation rests upon a theory that requires some reference to his contractual relationship with the union.  Nonetheless, the Court finds that Plaintiff's FEHA retaliation claim is still not preempted.  As the Ninth Circuit stated in Ramirez:

> [R]eference to or consideration of the terms of a collective-bargaining agreement is not the equivalent of interpreting the meaning of the terms. If it were, all discrimination actions brought by unionized employees would be preempted because the starting point for every case would have to be the agreement. Although the line between reference to and interpretation of an agreement may be somewhat hazy, merely referring to an agreement does not threaten the goal that prompted preemption--the desire for uniform interpretation of labor contract terms.
>
> . . . .
>
> The right to be free from discrimination, however, does exist independently of private agreements and cannot be altered or waived.  The [Supreme] Court in Allis-Chalmers stated that preemption analysis must focus on whether the state law at issue "confers nonnegotiable state-law rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the . . . claim is inextricably intertwined with consideration of the terms of the labor contract."  The Court's use of the phrase "or, instead," appears to indicate that where, as here, nonnegotiable rights exist independently of rights established by contract, evaluation of the claim asserted does not require consideration of the terms of any bargaining agreements. If such consideration is not required, in turn, preemption is obviously inappropriate.

998 F.2d at 749.  The Ninth Circuit's analysis as to the claim of racial discrimination in Ramirez is equally applicable to Plaintiff's asserted right in this case to be free from unlawful retaliatory conduct.  Although MEBA asserts in conclusory fashion that adjudication of the

9

state-law claim would require the Court "to analyze . . . contractual provisions," it has failed to identify any contractual provision whose meaning is disputed. Nor apparently could it do so, for Plaintiff's right to be free from retaliatory action, which was conferred by the California legislature via FEHA, does not depend on Plaintiff's contract with MEBA and could not be abrogated by it. The Court therefore concludes that Plaintiff's has advanced a "free-standing claim of [retaliation]" that does not require the interpretation of any specific representational duties or contractual obligations owed to him by MEBA. Audette, 195 F.3d at 1113. For this reason, the Court holds that Plaintiff's FEHA claim is not preempted.[1]

## II.  Retaliation Claims

Based on the foregoing analysis, the Court concludes that only Plaintiff's claim for retaliation requires an analysis on its merits. The Court further concludes that, whether viewed as arising under California or federal law, this claim for retaliation is subject to the same legal analysis. In determining the propriety of summary judgment on a discrimination claim under Title VII, this Court uses the analytical framework established by the Supreme

---

[1] Although this case presents an interesting question about the scope of preemption under federal labor law, it is difficult to see how the resolution of this question could affect the ultimate outcome of this case. In almost every respect, Plaintiff's federal and state-law claims present identical questions of fact and law. As discussed below, Plaintiff's federal claim is that MEBA retaliated against him because he previously filed a lawsuit against the union. Such claims, whether styled as a breach of the duty of fair representation or as a claim for racial discrimination, are governed by Title VII of the Civil Rights Act of 1964. See 42 U.S.C. § 2000e(c); see also McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 285 (1976) ("The same reasons which prohibit an employer from discriminating on the basis of race among the culpable employees apply equally to the union; and whatever factors the mechanisms of compromise may legitimately take into account in mitigating discipline of some employees, under Title VII race may not be among them.").

These same legal principles govern Plaintiff's state-law claim under FEHA as well. See, e.g., Schmoll v. Chapman Univ., 70 Cal. App. 4th 1434, 431 n.6 (1999) ("Because California courts find the "'antidiscriminatory objectives and the overriding public policy purposes'" of FEHA and federal civil rights legislation to be identical, we look to federal decisions for guidance." (quoting Fisher v. San Pedro Peninsula Hosp., 214 Cal. App. 3d 590, 606 (1989)); Sada v. Robert F. Kennedy Med. Ctr., 56 Cal. App. 4th 138, 148 (1997) ("In determining the propriety of summary judgment on a discrimination claim under the FEHA, we look to the test formulated by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981), for evaluating claims under title VII of the Civil Rights Act of 1964."). Thus, there is little, if any, appreciable difference between Plaintiff's state-law claim for retaliation under FEHA and his federal claim against MEBA, which likewise must be analyzed under Title VII. Thus, the possible preemption of Plaintiff's state-law retaliation claim makes little difference to the issues at stake in this case.

10

Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The California courts employ this same burden-shifting analysis to discrimination claims under FEHA. See Sada v. Robert F. Kennedy Med. Ctr., 56 Cal. App. 4th 138, 148 (1997). Thus, the McDonnell Douglas framework governs Plaintiff's only remaining cause of action against MEBA, whether it is viewed as a federal or state-law claim. See Bonilla v. Oakland Scavenger Co., 697 F.2d 1297, 1304 (9th Cir. 1982); Woods v. Graphic Commc'ns, 925 F.2d 1195, 1199-1203 (9th Cir. 1991).

That framework was aptly applied by the Ninth Circuit in the context of a motion for summary judgment on a claim for discriminatory retaliation in Miller v. Fairchild Industries, Inc., 797 F.2d 727 (9th Cir. 1986). In that case, the court wrote:

> The order and allocation of proof for Title VII suits outlined in McDonnell Douglas Corp. v. Green, also governs actions for retaliatory discharge . . . . To establish a prima facie case of discriminatory retaliation, a plaintiff must show that: (1) she engaged in an activity protected under Title VII; (2) her employer subjected her to adverse employment action; (3) there was a causal link between the protected activity and the employer's action. Causation sufficient to establish a prima facie case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge. Alternatively, the plaintiff can prove causation by providing direct evidence of retaliatory motivation.
>
> Once a plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-retaliatory explanation for the action. To satisfy this burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.
>
> If the employer successfully rebuts the inference of retaliation that arises from establishment of a prima facie case, then the burden shifts once again to the plaintiff to show that the defendant's proffered explanation is merely a pretext for discrimination.
>
> At the summary judgment stage in discrimination cases, the order of proof and shifting of burdens is viewed in light of the traditional summary judgment test. Thus, to withstand a motion for summary judgment, the opposing party must produce specific facts showing that there remains a genuine factual issue for trial and evidence significantly probative as to any material fact claimed to be disputed.

Id. at 730-31 (citations, footnotes, alterations, and internal quotation marks omitted). The summary judgment standard bears emphasis here. As the Ninth Circuit explained in Nissan Fire & Marine Insurance. Co. v. Fritz Companies, Inc., 210 F.3d 1099 (9th Cir. 2000), a party moving for summary judgment that does not have the ultimate burden of persuasion at

11

1 trial has the initial burden of either producing evidence that negates an essential element of
2 the non-moving party's claims or showing that the non-moving party does not have enough
3 evidence of an essential element to carry its ultimate burden of persuasion at trial. Id. at
4 1102. Where the party moving for summary judgment would bear the burden of proof at
5 trial, it bears the initial burden of producing evidence which would entitle it to a directed
6 verdict if the evidence went uncontroverted at trial. See C.A.R. Transp. Brokerage Co. v.
7 Darden Rests., Inc., 213 F.3d 474, 480 (9th Cir. 2000). If the moving party does not satisfy
8 its initial burden, the non-moving party has no obligation to produce anything and summary
9 judgment must be denied; if, however, the moving party satisfies its initial burden of
10 production, then the non-moving party may not rest upon mere allegations, or denials of the
11 adverse party's evidence, but instead must produce admissible evidence to show there exists
12 a genuine issue of material fact. Nissan Fire, 210 F.3d at 1102.
13     As to the first part of the McDonnell Douglas analysis, the Court concludes that
14 Plaintiff has established a prima facie case for retaliation. First, he has established that he
15 engaged in protected activity--namely, by filing a lawsuit to challenge racial discrimination.
16 Bergene v. Salt River Project Agric. Improvement and Power Dist., 272 F.3d 1136, 1140-41
17 (9th Cir. 2001). Second, he has established that he suffered an adverse employment action--
18 namely, his exclusion from a one-day job with American Ship Management and his
19 termination from a job aboard the *Cape Horn*. Third, he has set forth testimony that
20 establishes a plausible causal connection between the protected activity and MEBA's actions.
21 Specifically, he has testified that one of MEBA's representatives deliberately interfered with
22 his employment opportunities and arranged for his exclusion and termination from these two
23 jobs. See, e.g., Decl. of Paul L. Guidry at 2 ("In or around March 2005, Anderson told me
24 that I could not work for APL. . . . Anderson told me that he was going to call APL,
25 presumably to have me fired based on his tone. APL fired me."); id. ("Anderson continued
26 to tell me that he was going to get me for suing MEBA. Anderson began to visit my job and
27 talk to my supervisor, Tim Welty, about me."). He further testified that Anderson was
28 present at, and participated in, the meeting in which Plaintiff was fired from his position

aboard the *Cape Horn*. The timing of these events, combined with Plaintiff's testimony that Anderson explicitly indicated an intention to "get him" for suing MEBA, is sufficient to establish a causal relationship between the protected activity (the filing of an anti-discrimination suit) and the adverse employment action (Plaintiff's termination from two union jobs).

MEBA puts forth several arguments as to why Plaintiff's prima facie case is insufficient. First, MEBA suggests that Plaintiff has not suffered any adverse employment action. The union argues that it represented him fairly and diligently in his grievance against Marine Transport Lines; that it had no connection to certain events described in the complaint, such as the vandalization of Plaintiff's picture at the hiring hall; that it did not demote him to a lower rank within the union; and that Plaintiff continued to visit the hiring hall regularly even after his termination from the *Cape Horn*. These assertions all may be true, but they are of limited relevance to the thrust of Plaintiff's complaint for retaliation, which is that MEBA orchestrated his termination from two union jobs in response to his previous lawsuit. As to that argument, MEBA has two responses, neither of which is persuasive. First, MEBA asserts Plaintiff lost his job only days before Marine Transport Lines lost its government contract and all union members were forced to leave the *Cape Horn*. Thus, MEBA contends, Plaintiff can recover at most only a few days of wages. This argument, however, is not about whether Plaintiff suffered an adverse employment action; it is about the amount of damages he would be entitled to recover as a result of that action. The fact that his claim may not be worth many thousands of dollars in lost wages says nothing about whether he has a claim in the first place. Second, MEBA argues that Plaintiff is precluded from recovering any damages for his termination because he withdrew his grievance against the two marine companies. This argument is simply incorrect. Plaintiff withdrew his grievance against those two defendants because they settled his lawsuit against them. Plaintiff's settlement with other defendants, however, does not foreclose him from suing MEBA, nor does it preclude his recovery for damages that MEBA's alleged

13

misconduct may have cause him. In short, the Court is unpersuaded by any of the arguments set forth by MEBA regarding the deficiency of Plaintiff's prima facie case.

Having set forth evidence that would allow a reasonable jury to find a prima facie case of retaliation, McDonnell Douglas then requires MEBA to come forward with legitimate reasons for its actions. The Court assumes, without deciding, that MEBA has done so in this case. See, e.g., Dep. of James Martin Anderson at 99 ("I had nothing to do with it. It was [American Ship Management] who was telling me that they weren't going to hire this individual."); id. at 31 ("At that point, all I knew about was he was being fired for an action that happened to a forklift where he was running no oil in the forklift. That's a fireable offense."). Upon the proffer of a legitimate explanation for the termination, the burden returns to Plaintiff to demonstrate that MEBA's proffered justification is a pretext for its retaliation. As to the legitimate or pretextual nature of MEBA's explanation, the record currently before the Court contains evidence from which a reasonable jury could rule in favor of either Plaintiff or MEBA. Compare id. at 99 ("If they say they're not going to hire him, they're not going to pay him, I can't do anything. Okay. And that's as much as I remember about that conversation."), with Decl. of Paul L. Guidry at 1-2 ("In February 2005, MEBA Representative James M. Anderson told me multiple times that he was going to get me for suing MEBA. Anderson had been telling me that he was going to get me since about June 2004."). Summary judgment is therefore inappropriate on Plaintiff's claim for retaliation, and Defendant's motion as to Plaintiff's Second Cause of Action is hereby DENIED.

**CONCLUSION**

Plaintiff's claims for racial discrimination (First Cause of Action) and for wrongful termination (Fifth Cause of Action)--were not asserted against MEBA, the only remaining defendant, and have already been dismissed without prejudice. Plaintiff's does not oppose summary judgment as to his claims for harassment and hostile work environment (Third Cause of Action), for intentional infliction of emotional distress (Sixth Cause of Action), and for negligence (Seventh Cause of Action). Defendant's motion for summary judgment as to these claims is therefore GRANTED. Further, the Court finds that Plaintiff's claim for

interference with prospective economic relations (Fourth Cause of Action) is preempted by federal labor law, and Defendant's motion for summary judgment as to this claims therefore is also GRANTED.

As to Plaintiff's claim for retaliation (Second Cause of Action), the Court finds that Plaintiff's state-law claim under FEHA is not preempted.  Whether this claim for retaliation is viewed as a claim arising under state law (FEHA) or under federal law (Title VII), the Court further concludes that sufficient evidence exists for a reasonable jury to conclude that Plaintiff has established a prima facie case for retaliation, and further, that a reasonable jury could conclude based on the parties' conflicting accounts of the pertinent events, that MEBA's proffered justification for its conduct was a pretext for its attempt to retaliate against Plaintiff in response to his previous lawsuit.  Accordingly,  Defendant's motion for summary judgment as to Plaintiff's claim for retaliation is hereby DENIED.

The parties are hereby ORDERED to appear before the Court for a status conference on April 13, 2007, at 8:30 a.m.

**IT IS SO ORDERED.**

Dated: March 6, 2007

CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE